492 A.2d 354

**James BRITTINGHAM, Jr.**

v.

**STATE of Maryland.**

**No. 1109, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

May 14, 1985.

Sally C. Chester, Baltimore (Roland Walker and Walker, Rubin & Van Bavel, P.A., Baltimore, on brief), for appellant.

Diane G. Goldsmith, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and Gary D. Schenker, Asst. State's Atty. for Baltimore City, Baltimore, on brief), for appellee.

Argued before MOYLAN, GARRITY and ALPERT, JJ.

ALPERT, Judge.

A request for counsel is not always relevant to the voluntariness of a confession. Startling? Not under the unique circumstances of this appeal.

## I.  THE FACTS

This case arises from a break-in at the home of Joseph and Debra Kiss in Baltimore City which occurred shortly after midnight on October 10, 1982. The break-in was carried out by two male intruders, one armed with a hand-

gun and the other with a knife. Mr. and Mrs. Kiss and their infant son were home at the time of the occurrence. The intruders ordered Mr. Kiss to turn over all of the family's money, and he complied. Mr. Kiss was then escorted to the second floor where he was bound and gagged. Mrs. Kiss was taken at knife-point to the basement where she was forced to have sexual intercourse with both of the intruders. Immediately thereafter, Mrs. Kiss was taken back upstairs, where she was bound and gagged. The intruders then left the Kiss home taking, according to the Kisses, $500 in cash, jewelry, and the keys to their 1979 green Cadillac. The Cadillac, which was parked outside, was also taken by the intruders.

Eventually, Mrs. Kiss was able to loosen her bonds, untie her husband and summon the police. The Kisses' son was not harmed in any way. After the police arrived, Mrs. Kiss was transported to City Hospital for examination and treatment. Subsequently, appellant and one Dennis Pierson drove the Kisses' Cadillac to Ohio, where both were arrested.

Ultimately, appellant was charged with various offenses which occurred at the Kiss residence on October 10, 1982, and he was subsequently convicted by a Baltimore City jury (Arabian, J., presiding) of rape in the first degree, robbery with a deadly weapon, use of a handgun in a crime of violence, burglary and false imprisonment. He was sentenced to life imprisonment for the rape, a consecutive term of 20 years for robbery with a deadly weapon, a concurrent term of 20 years for the handgun offense, a concurrent term of 20 years for the burglary, and 10 years (consecutive to the rape sentence) for false imprisonment. Appellant noted a timely appeal to this court and asks whether:

(1) the admission into evidence for impeachment purposes of an oral confession allegedly made by appellant violated appellant's right to due process because such confession was made involuntarily

(2) the trial court erroneously excluded evidence proffered by appellant which was relevant and material to the issue of the voluntariness of appellant's confession

(3) appellant's motion for new trial was improperly denied by the trial court where the court's refusal to consider newly discovered evidence constituted an abuse of discretion

(4) the trial court committed error in its instruction to the jury with regard to the effect of evidence of flight

We respond in the negative and therefore affirm the judgments of the court below.

## II.  PRE–TRIAL TESTIMONY ON THE CONFESSION

Prior to the start of the trial, the judge heard motions brought by appellant to suppress two statements he made. The first inculpatory statement was made to Detective Robert Jansen of the Sex Offense Unit of the Baltimore City Police Department following appellant's trip back to Baltimore after being arrested in Ohio.  The second inculpatory statement was made to Corporal Richard Sheldon of the Maryland State Police prior to the administration of a polygraph examination.  It is this second statement which forms the centerpiece of this appeal.

Two hearings were conducted by the trial judge.  At the first hearing, testimony was elicited from Corporal Sheldon and Detective Jansen as to the circumstances surrounding each of the two statements.  Corporal Sheldon testified that appellant was transported to the State Police barracks on October 6, 1983, for the purpose of taking a polygraph examination.  Appellant had requested the lie detector test. Appellant was advised of his rights pursuant to *Miranda* and a civil waiver form (pertinent to the polygraph) was explained to him.  Appellant signed this form after reviewing it point by point with Corporal Sheldon, along with a release form.  Corporal Sheldon then testified that appellant made a statement to him prior to the administration of

the polygraph. In this statement appellant admitted that he was present at the Kiss residence on the evening in question for the purpose of purchasing some cocaine. Appellant stated that McBee, a co-felon, pulled a knife on Mrs. Kiss and that he then pulled a gun. According to appellant, McBee later took the gun from him. Appellant further stated that it was McBee who took Mrs. Kiss downstairs where the rape occurred. Appellant contended that he remained upstairs, but admitted removing certain articles from the Kiss residence and leaving the premises in the Kisses' green Cadillac. Finally Corporal Sheldon testified that appellant informed him that he and Dennis Pierson subsequently left the state in the stolen Cadillac and drove to Ohio, the situs of their eventual arrest. Corporal Sheldon denied making any promises or inducements to appellant or telling appellant that any delay in the polygraph would "cost him a fortune."

Detective Jansen was then called to testify regarding the other statement at issue. Jansen testified that he travelled to Ohio on October 29, 1982, to transport appellant and Dennis Pierson back to Maryland. He advised both men of their *Miranda* rights and warned them that it was a long trip back and that it would be best not to discuss the case. In fact, the case was not discussed in the car; however, appellant made a statement to the detective upon their arrival in Baltimore. Detective Jansen testified that appellant admitted his involvement in the robbery, but denied any participation in the rape. Appellant also stated that Pierson was not involved in the incident in any capacity and identified Randy McBee as his co-felon and the rapist. Detective Jansen denied questioning the appellant prior to the statement, but indicated that the statement may have been prompted by Pierson who was interested in extricating himself from the whole situation.

In ruling on the admissibility of the two statements, the trial judge had no difficulty in finding that the statement to Detective Jansen was admissible. The trial judge found that the statement was not preceded by any interrogation,

but instead was "more or less in response to the other person, who was in the vehicle. And was at most a blurt or an answer to the question of a friend who was trying to extricate himself...." The trial judge initially reserved ruling on the statement to the polygraph operator, but later ruled it to be admissible. The trial judge found that *Miranda* warnings had been given, that the statement was voluntary and that it was simply an extension of the earlier statement. The judge then proceeded with jury selection.

Before the trial began, however, appellant came forward with additional evidence as to the motion to suppress the statement to the polygraph operator. Defense counsel called both Marcie Simpkins, a paralegal, and the appellant to testify. Ms. Simpkins testified that Michael Ryan, an investigator with the Baltimore City State's Attorney, called her office on October 6, 1983, because the appellant had voiced a request to discuss the lie detector with his attorney. She informed Ryan that appellant's counsel was out of town and suggested that the test be postponed. Ryan did not tell her a future polygraph could not be scheduled.

Appellant then testified that he was informed that any delay would cost him a fortune. He understood that although the polygraph, which he had requested, was free that day, he would be charged for a test administered at a future date. Appellant also testified that he had requested that his attorney be present, but was informed that he was in Spain and that it would be best to proceed without him.

The State then called Investigator Ryan. Ryan admitted calling appellant's attorney, but denied telling appellant that he would be charged if the lie detector were postponed. He did admit informing appellant that it could take up to six weeks to reschedule the test.

After hearing this additional evidence, the trial judge granted the motion to suppress finding that the statement was a confession obtained contrary to the mandate of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## III. TRIAL TESTIMONY ON THE CONFESSION

Trial on the merits then commenced. Detective Jansen testified during the State's case-in-chief about the statement appellant made to him upon their arrival in Baltimore. This testimony essentially mirrored that elicited at the pre-trial motion, *i.e.*, that appellant admitted his involvement in the robbery, but denied raping Mrs. Kiss.

Appellant testified on his own behalf and denied participating in the robbery and rape or even seeing Debra or Joseph Kiss on the evening in question. Appellant did admit being in the green Cadillac a few hours after the robbery, but contended that an acquaintance, Randy McBee, picked him up on Eastern Avenue between 3:00–4:00 a.m. Appellant further testified that he did not know, at that time, who owned the vehicle. According to appellant, he and McBee had separated around 11:30 p.m., at which time McBee left a bar allegedly to purchase cocaine. Appellant contended that he met a girl named "Mary" around midnight and spent the next several hours with her at the New Motel. Appellant was unable to locate Mary at the time of trial and did not recall her last name.

Following their meeting on Eastern Avenue, appellant testified that he and McBee drove the Cadillac to Pennsylvania, where McBee was arrested for assaulting his girlfriend. Appellant then returned to Baltimore in the Cadillac and subsequently met with Dennis Pierson. Pierson and appellant then drove the vehicle to Ohio, where both were arrested. It was at this point that Detective Jansen picked them up for the return trip to Baltimore. Appellant denied admitting any involvement to Jansen, but indicated that he may have incriminated McBee because it was McBee who gave him the car.

As to the incident with Corporal Sheldon prior to the lie detector, appellant denied admitting that he saw the Kisses on the evening of the crimes. He did testify to telling Sheldon he believed McBee committed the crimes.

Corporal Sheldon was called by the State during its rebuttal. Sheldon testified, over objection, that the appellant indicated that he saw the Kisses at their residence on the date in question.[1] Appellant also admitted to Sheldon that various articles were removed from the Kiss residence, including $20.00 in cash, syringes, a bottle of wine and the green Cadillac but denied having intercourse with Mrs. Kiss. Through cross examination, appellant tried in vain to establish that he wanted counsel present at the taking of the lie detector test. All objections as to appellant's reference to legal representation were sustained by the trial judge. Appellant did not, however, assert that he refused to proceed with the test without the benefit of counsel.

Investigator Ryan was also called as a rebuttal witness. Ryan testified that appellant denied participating in the robbery when Sheldon asked him to repeat his earlier statement. Defense counsel attempted to question Ryan regarding appellant's request for an attorney at the polygraph, but the trial judge sustained all objections to such questions.

Appellant was then recalled to the stand in surrebuttal and was the final witness heard at trial. Defense counsel unsuccessfully attempted to elicit testimony regarding appellant's request for his attorney at the polygraph. All of the State's objections were sustained by the trial judge.

## IV. THE CONFESSION (the statement to the polygraph operator)

### A. *Voluntariness of the Confession*

Appellant contends that the trial court erred in admitting (during the State's rebuttal) his "alleged inculpatory state-

---

1. We note that appellant was successful in having this line of testimony suppressed and therefore the State could not use the admissions (confessions) in its case in chief, *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 *see also Bryant v. State,* 49 Md.App. 272, 431 A.2d 714, *cert. denied,* 291 Md. 772 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982). The statements were, however, admitted in rebuttal. *See* discussion at Part IV *infra.*

ment" to the polygraph examiner for the purpose of impeaching his credibility. He argues, somewhat obliquely, that it was involuntary as a matter of law. He incorrectly asserts that the trial judge "failed to explicitly rule on the issue of voluntariness prior to allowing the statement to be used for impeaching appellant's credibility," when the record clearly belies this contention. The statement of Corporal Sheldon, although later deemed inadmissible (as part of the State's case in chief) under *Bryant,* was initially deemed fully admissible because *Miranda* warnings were given and there was no evidence of coercion, *i.e.,* the statement was considered to be voluntary. Shortly before trial, the court rendered a bench opinion and in pertinent part said:

Gentlemen, there were a number of issues raised yesterday. I reserved a ruling concerning, first of all, the admissibility of the statement made by the defendant to the examiner of the polygraph test.

In reviewing the cases, on the first issue, of whether the examiner sufficiently advised the defendant of his *Miranda* warnings, I refer you to the case of *State v. Taylor,* ... That case, as far as I know, has never been overruled and extended, and the warnings, in this case, sufficiently comply with the *Miranda* warnings.

Number 2, on the second issue, in the case, is whether that statement was voluntarily given under the circumstances described in the evidence.

According to the polygraph examiner, the statement was totally voluntary. That evidence has not been rebutted in any way. I refer you to the case of *Johnson v. State,* 31 Md.App. 303 [355 A.2d 504]. That case was one where the statement was given, following a polygraph test. The court held that the statement itself is admissible. The issue of its voluntariness is again, of course, a matter for the jury to determine. And while the results of the polygraph test are not admissible, the fact that there was a polygraph test and the circumstances giving the statement, are issues, before the jury, to determine

the voluntariness if that, in fact, becomes an issue; depending on what you wish to do and how you wish to approach it.

Just as I had some reaction to the fact that the circumstances might lead to some kind of coercion, the jury has that issue before it, before me. *There was no evidence presented by the defense, that it was coercive in any way. I am left with only the evidence presented by the State that it was totally voluntary.*[2]

I may add that the statement is an extension of the statement he gave earlier, when it was simply a blurt; which also adds to the contention that it was a voluntary statement, on the basis of the evidence before me, at this time. The motion to suppress is denied.

(emphasis added).

As we approach the twentieth anniversary of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we observe that no area of constitutional criminal procedure has provoked more debate over the last two decades than that dealing with confessions precipitated by police interrogation. As we stated in *Bryant v. State,* 49 Md.App. 272, 273–74, 431 A.2d 714, *cert. denied,* 291 Md. 772 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982):

[T]he Supreme Court of the United States, in a series of cases, . . . (citations omitted) culminating in the landmark decision of *Miranda v. Arizona,* has nullified the legality of confessions obtained through duress, whether physical or mental.

---

**2.** When the trial judge reversed her ruling on the admissibility of the statement made to Corporal Sheldon, she did so on the "first issue," *i.e.,* a *Miranda* violation under *Edwards v. Arizona* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and *Bryant.* The "second issue" was not addressed by the court or defense counsel when the court reconsidered its ruling shortly before trial. At no time during the trial did defense counsel seek an additional evidentiary hearing, if indeed any was required. *See State v. Kidd,* 33 Md.App. 445, 366 A.2d 761 (1976), *aff'd on other grounds,* 281 Md. 32, 375 A.2d 1105, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

We pause for the moment to emphasize that what the Supreme Court has nullified is the legality of confessions *obtained through duress*, whether physical or mental. Assuming *arguendo* that Brittingham's statement to Corporal Sheldon was the product of interrogation, we shall determine if the Brittingham statement was involuntary as a matter of law.

Initially, we note that certain now well-established principles of constitutional criminal procedure are undisputed herein.

■ 1. When an accused, under custodial interrogation, demands the right to counsel, all interrogation must cease at that point. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Bryant v. State,* 49 Md.App. 272, 431 A.2d 714, *cert. denied,* 291 Md. 772 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

■ 2. When a confession is sought to be excluded on the grounds of a violation of defendant's *Miranda* rights and is deemed inadmissible during the State's case in chief, it may nevertheless be used for impeachment purposes if the defendant testifies in apparent contradiction to the initially inadmissible statement. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *State v. Kidd,* 281 Md. 32, 375 A.2d 1105 *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

■ 3. The limited use of the defendant's confession for impeachment purposes is prohibited when, as a matter of law, it was involuntarily obtained. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Appellant, not satisfied with suppression of his statement under *Bryant v. State* and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) during the State's case in chief, tried to persuade the court that his statement was inadmissible for all purposes. Citing *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), he

now argues that it was inadmissible as a matter of law. In *Mincey* the Court stated that the standard for voluntariness is whether the statement is "the product of a rational intellect and a free will." 437 U.S. at 398, 98 S.Ct. at 2416 (citations omitted).

■ Quite apart from the constitutional pronouncements of the United States Supreme Court, Maryland law strictly prohibits the introduction of an involuntary confession. As recounted by Judge Dudley Digges in the *Hillard* opinion, "Maryland criminal law requires no confession or other significantly incriminating remark allegedly made by an accused be used as evidence against him, unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." *Hillard v. State*, 286 Md. 145 at 150, 406 A.2d 415 (1979) (footnote omitted). Brittingham argues here, as he did below, that he was told by the officer that a postponement of the polygraph examination would cause a delay of four-to-six weeks and further, that he was told the delayed examination would cost him money. Although he refers to this as "additional evidence" generating an issue of voluntariness, we observe that that evidence also was presented to the trial court immediately before the trial and, as indicated earlier in this opinion, the trial court held, perhaps gratuitously at that point, that the statement was voluntary.

Appellant argues that pressure was brought to bear upon him in making the statement and that "although the circumstances were not as extreme as in *Mincey*, . . . the psychological exertion pressed upon appellant was sufficient to render his confession involuntary." The "psychological exertion" which he refers to is the undisputed fact that his refusal to take the lie detector test, a test which we emphasize *he requested*, meant that the test would not be available for another four-to-six weeks. He further argues that the suggestion that he would have "to meet an additional financial burden to prove his innocence [through the taking

of the test] when [he] had already been incarcerated for almost a year" qualifies as " 'coercion' necessary to render appellant's alleged statement 'involuntary.' "

There are many factors apparent in the record which run counter to appellant's argument. Corporal Sheldon denied that he told Brittingham that a delay in taking the test would cost him money. The *Miranda* waiver form was signed by Brittingham after he knew that his lawyer would not be available. The polygraph release was likewise signed at a point in time when appellant, knowing his lawyer was unavailable, was able to reflect and make a free choice as to whether he should take the test. It is crystal clear that he believed the test would exonerate him from the rape charge. He was aware that a delay might consequentially cause him to go to trial on the rape charge.

■ The trial judge had the opportunity to see the witnesses and judge their credibility. As to the conflict in the testimony between Brittingham and Corporal Sheldon, she opted to believe Corporal Sheldon. Our own independent constitutional review of the record, *see Finke v. State*, 56 Md.App. 450, 468 A.2d 353 (1983), *cert. denied*, 299 Md. 425, 474 A.2d 218 (1984), persuades us that the trial judge did not err. The statement made by appellant was not involuntary as a matter of law.

## B. *Evidence Relevant to the Confession*

Next, appellant contends that "assuming arguendo that the statement used to impeach appellant's credibility was properly admitted in rebuttal," the trial court erred in excluding his proffered evidence on the issue of voluntariness of that statement. Apparently, appellant argues that although he denied making the contested statement, to those who might believe that it was made, his failure to have counsel present as he requested tends to establish the involuntary nature of the statement he denied making. More specifically, he argues that the trial court's refusal to allow his attorney to cross-examine the polygraph examiner

and the investigator, or to introduce evidence through defense witnesses as to appellant's request for an attorney, the consequence of a possible delay in taking the test, and the cost to him if the examination were postponed amount to reversible error.[3] He asserts that the exclusion of this evidence was severely prejudicial to him in his attempt to rebut the polygraph examiner's statement that appellant was not coerced. Further, maintains appellant, by introducing his statement in rebuttal, the State placed the issue of voluntariness before the jury.

When a confession is challenged as involuntary, the defendant is entitled to a "clear-cut determination" that the confession *is* voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). The burden is cast upon the State to prove voluntariness by a preponderance of the evidence. *Id.* The states are then free to adopt a higher standard, if they so desire. *Id.* Maryland has adopted a two-step procedure for determining whether a confession was freely and voluntarily made.

> Demonstrative of the importance that we have long placed upon this mandate is the imperative that the voluntary nature of a confession be twice established before it can be utilized by the trier of fact, together with any other evidence, in determining guilt or innocence—initially, to the satisfaction of the trial judge, out of the hearing of the jury, as a mixed question of law and fact, and then, if the statement has been placed in evidence, by a determination of the trier of fact, be it court or jury, that beyond any reasonable doubt the confession was freely and voluntarily made.

---

**3.** As we view the record, appellant was successful in placing into evidence (1) the fact that he was told refusal to take the test would cause a 4-to-6 week delay and (2) that Corporal Sheldon told him that there would be a cost for taking the test on another date. Accordingly, we shall limit our analysis with respect to this issue (IV–B) to the relevance of the evidence which was excluded, *i.e.,* appellant's request for his attorney.

*Hillard,* 286 Md. at 151, 406 A.2d 415. During this two-tiered procedure, the State must affirmatively show the free and voluntary nature of the statement. *Id.* Any charge that coercive tactics were used must be rebutted. *Gill v. State,* 265 Md. 350, 353, 289, A.2d 575 (1972); *Darby v. State,* 45 Md.App. 585, 594, 414 A.2d 248 (1980).

■ In the two-step procedure, the judge and jury each have a distinct role. The primary role of the judge is to determine the admissibility of the evidence at the outset. The jury then decides what weight, if any, to give to the confession. *Bellamy v. State,* 50 Md.App. 65, 72–73, 435 A.2d 821 (1981), *cert. denied,* 292 Md. 376 (1982). The jury must, however, totally disregard the confession absent a finding that it is voluntary beyond a reasonable doubt. *Id.* [50 Md.App.] at 73, 435 A.2d 821.

■ The jury has a key role in both determining voluntariness and analyzing the evidence once admitted and, accordingly, has the right to hear all factors [4] which relate to the confession's voluntary nature.

That the appellant, through counsel, sought the lie detector test is undisputed. That he signed the *Miranda* waiver [5] understanding its effect is undisputed. That he signed

---

**4.** Although not intended to be an exhaustive list, the Maryland courts have compiled a list of eleven factors which should not be overlooked when examining voluntariness: (1) the accused's age; (2) the accused's character; (3) the accused's familiarity with police procedures; (4) educational background; (5) intelligence; (6) the legality of the arrest; (7) the conditions of incarceration; (8) delay in presentment; (9) removal to a distant jail; (10) prolongation of interrogation; and (11) failure to warn the accused of his rights. *See Finke v. State,* 56 Md.App. at 488–89, 468 A.2d 353.

**5.** Corporal Sheldon read the *Miranda* form aloud at the pretrial motion to suppress and testified that appellant indicated that he understood each provision. This form included, in pertinent part, the following provisions:
   —"I understand that: I have an absolute right to remain silent."
   —"I have a right to talk to a lawyer and have him present now or at any time during the questioning. If I proceed to answer any questions without a lawyer, the questioning will stop if I should change my mind, and request the presence of a lawyer."

the polygraph release [6] understanding its effect is undisputed.

In the case *sub judice*, the trial court, on the grounds of relevancy, or lack of it, refused to permit appellant to testify regarding his request for counsel prior to the polygraph.

In his challenge to that ruling, appellant posits, implicitly at least, that the fact that counsel was sought but was unavailable was relevant to the issue of voluntariness, *i.e.*, it would tend to establish that Brittingham's statement was involuntary. It has been stated that:

> There are two components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. . . .
>
> The second aspect of relevance is probative value, the tendency of evidence to establish the proposition that it is offered to prove.

*McCormick on Evidence* § 185 (E. Cleary 3rd ed. 1984). In more graphic terms,

> [r]elevancy indicates a relationship between facts. The existence of fact A is relevant as tending in reason to prove the existence of fact B, if the existence of B is more likely or probable when A exists than it would be if A did

---

—"I've elected of my own free will, without any force, threats, or promises, to answer verbally all questions asked."

**6.** The "Request and Release" form as to the polygraph provided, in pertinent part: "I hereby voluntarily request that I be examined by the Maryland State Police Polygraph (detection of deception) technique. I understand and agree that the results of the Polygraph Examination may be made available to the proper authorities."

not exist; and evidence tending in reason to prove the existence of A is relevant evidence of the existence of B. E. Morgan, *Basic Problems of Evidence* 183–84 (1962).

▆▆▆▆ The determination of relevancy is a matter within the sound discretion of the trial court. *Holt v. State*, 50 Md.App. 578, 581, 438 A.2d 1386 (1982). In the absence of an abuse of that discretion, the determination will not be disturbed on review. *See Tipton v. State*, 39 Md.App. 578, 586, 387 A.2d 628, *cert. denied*, 283 Md. 739 (1978).

▆▆▆ In determining relevancy, we must remember that after he was advised of his right to counsel per *Miranda*, and after fully understanding that his lawyer would not be present, Brittingham opted to go forward with the polygraph test. It is clear that he knew he had the alternative of not proceeding with the test at that time, in which event no further questions would have been asked. He did not assert here or in the trial court that he was denied counsel, or that there were any threats or promises made during the course of the interrogation—an interrogation which he functionally initiated. Thus, it logically follows that the request to have counsel present, which was followed by a legally unassailable waiver of counsel, simply would not tend to prove that the statement (which he denied even making) was involuntary.

The trial judge was keenly aware of the fact that Brittingham, after being told that his lawyer was unavailable, waived his rights under *Miranda* and signed a polygraph release.

Appellant, in effect, is asking us to ignore the fact that he twice waived the presence of counsel; first when he expressly waived pursuant to the *Miranda* litany and second when he opted to go forward with the polygraph examination. The Supreme Court of the United States recently said as much in *Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982). There, a soldier charged with raping an 81-year-old woman, after discussing the matter with his private defense counsel and with a military attorney, re-

quested a polygraph examination. Prior to undergoing the polygraph examination, the defendant was advised of his rights, per *Miranda,* and he stated that he did not want a lawyer to be present. An agent of the Army's Criminal Investigation Division, at the conclusion of the polygraph examination, told the defendant that there had been some deceit. The defendant then admitted having intercourse with the victim. The agent then asked the defendant if he wished to discuss the matter further with another agent and with the police. The police read the *Miranda* warnings before asking questions and the defendant repeated that he had had sexual contact with the victim. This testimony was admitted at the trial, the accused was convicted, and an appeal followed. The Missouri Court of Appeals affirmed the judgment, 538 S.W.2d 348 (1976). The United States District Court for the Eastern District of Missouri denied the accused's petition for a writ of habeas corpus. On appeal, the United States Court of Appeals for the Eighth Circuit directed that the petition for a writ of habeas corpus be granted, holding that the evidence was obtained in violation of the Fifth Amendment right to have counsel present at an interrogation, 682 F.2d 154 (1982).

On certiorari, the United States Supreme Court reversed and remanded, holding that the defendant waived his Fifth Amendment right to have counsel present at an interrogation and that by requesting a polygraph examination the accused initiated the interrogation. *See also Fields v. Wyrick,* 706 F.2d 879 (8th Cir.1983).

The facts in evidence before the jury clearly show the absence of counsel. The triers of the facts were aware that there was no evidence that counsel was present. To state that (initially) he wanted his lawyer, but that he was not available, did not tend in reason to prove that the uttering of an inculpatory statement was coerced or induced—that it was not the free and voluntary act of the accused. *See State v. Kidd,* 281 Md. 32, 35, 375 A.2d 1105, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

## V.  THE MOTION FOR NEW TRIAL

■■ Appellant's third assignment of error is that the trial court erred in denying his motion for a new trial.  At the hearing, appellant's sister testified that the State's expert medical witness committed perjury when testifying about Mrs. Kiss's medical report.  The sister testified that she was present in the courtroom when the doctor, before he testified, allegedly admitted that he had never before "filed" the standardized Maryland rape report, but on the stand the doctor testified that he reviewed the report approximately one week before testifying.  The trial court ruled that such testimony was inadmissible because of its hearsay nature.  Without expressing any opinion as to this possible evidentiary hurdle, we do not believe the trial court abused its discretion in denying the motion.  We note that the two statements are not necessarily inconsistent.  That the doctor never *filed* such a report is clearly not the same as never having *seen* the subject report.

■■ Assuming *arguendo* the inconsistency, it is well established that the grant or denial of a motion for a new trial is a matter vested within the sound discretion of the trial judge and, as such, it will not be disturbed on appeal absent a clear abuse of that discretion.  *State v. Devers,* 260 Md. 360, 376, 272 A.2d 794, *cert. denied,* 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971).  Discretionary rulings by a trial judge "carry a presumption of validity," and, accordingly, "the burden of establishing an abuse of discretion in a particular case lies with the appellant." *Mathias v. State,* 284 Md. 22, 28, 394 A.2d 292 (1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).  Appellant contends that the alleged perjurious testimony constitutes "newly discovered evidence," and thereby entitles him to a new trial.  We disagree.  Appellant's sister overheard this conversation during the State's presentment of its case, yet no mention of it was made prior to the motion for a new trial.  As stated by this Court in *Jones v. State,* 16 Md.App. 472, 298 A.2d 483, *cert. denied,* 268 Md. 750 (1973), "the

evidence must be in fact, newly discovered, *i.e., discovered since the trial....*" 16 Md.App. at 477, 298 A.2d 483 (emphasis added) (citations omitted). This evidence was clearly discovered during the trial, as opposed to "since the trial". *Id.* Furthermore, without even reaching the issue of materiality, the fact that this information was not put forth at any time during the trial indicates a lack of *diligence* on appellant's part. Hence, appellant would not be able to allege "facts ... from which the court [could] infer diligence", as required, in a motion for a new trial. *Jones,* 16 Md.App. at 477, 298 A.2d 483 (citations omitted).

We do not believe that the appellant demonstrated an abuse of discretion by the trial judge, and, accordingly, affirm the denial of the motion.

## VI.  THE "FLIGHT" INSTRUCTION

■■ Appellant's fourth assignment of error is that the trial court erroneously instructed the jury on the effect of evidence of flight. Specifically, the trial judge stated:

There was testimony that the defendant left the State after the alleged crimes. While flight alone is not sufficient to convict, it is universally admissible as evidence of consciousness of guilt and thus of guilt itself. It is for you to determine from the credibility of the evidence whether or not there was flight and whether or not it was caused by consciousness of guilt or by some other innocent motive.

Appellant contends that instructing the jury that flight could be evidence "of guilt itself" contradicted the first portion of the instruction, misstated the law and confused the jury. We disagree.

The portion of the instruction appellant has objected to is a direct quotation from a Court of Appeals decision. In *Jones v. State,* 242 Md. 323, 219 A.2d 77 (1966), the Court addressed a sufficiency issue in which one of the incrimina-

ting factors considered by the judge [7] was testimony that Jones was seen fleeing from the scene. In finding that the testimony was a proper consideration, the Court opined: "While flight alone is not sufficient to convict, it is universally admissible as evidence of consciousness of guilt, and thus of guilt itself." *Id.* at 327, 219 A.2d 77 (citing *Davis v. State*, 237 Md. 97, 105, 205 A.2d 254 (1964), *cert. denied*, 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965)). The trial judge clearly did not misstate the Maryland law.[8]

The instruction, taken as a whole,[9] is neither contradictory nor confusing.

Accordingly, for all the reasons herein stated, we affirm.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.

---

7. The *Jones* case centered upon a trial before a judge, thus, there was no specific issue as to jury instructions.

8. Appellant's reliance on *Sewell v. State*, 34 Md.App. 691, 368 A.2d 1111, *cert. denied*, 280 Md. 734 (1977) does not alter our position because it does not forbid the instruction given herein.

9. *See generally State v. Grady*, 276 Md. 178, 185, 345 A.2d 436 (1975) (citations omitted) ("jury instructions ... must be viewed as a whole and that portions should not be read out of their proper context.")